2023R00741/KJC

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Zahid N. Quraishi |
| v. | : | Crim. No. 23-cr-982 |
| ALOK SAKSENA | : | 18 U.S.C. §§ 1343, 1346, 1349 |

RECEIVED NOV 28 2023 AT 8:30 CLERK, U.S. DISTRICT COURT - DNJ

## INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

### DEFENDANT AND OTHER INDIVIDUALS AND ENTITIES

1.  During the time period relevant to the Information:

    A.  Airline-1 was an airline headquartered in Chicago, Illinois. Newark Liberty International Airport ("Newark Airport") in New Jersey was one of Airline-1's hubs.

    B.  Defendant ALOK SAKSENA ("defendant SAKSENA") was a Director in Corporate Real Estate ("CRE") for Airline-1 and worked at Newark Airport.

    C.  Co-Conspirator-1 was a contractor who worked exclusively for Airline-1 at Newark Airport. Co-Conspirator-1 worked as a Project Manager in CRE for Airline-1.

    D.  Co-Conspirator-2 was employed by Airline-1 and worked at Newark Airport. Beginning in or about August 2022, Co-Conspirator-2 was a Senior Manager for Airport Operations Projects and Execution for Airline-1. Prior to that,

from in or about March 2022 to in or about August 2022, Co-Conspirator-2 was a Manager in Facilities Maintenance Operations for Airline-1. From in or about October 2020 to in or about March 2022, Co-Conspirator-2 was a Senior Supervisor in Facilities Maintenance Operations for Airline-1.

E. Due to their positions at Airline-1, defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 each were able to influence which companies would be awarded certain Airline-1 contracts. Defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 each owed Airline-1 a duty to refrain from seeking, accepting, and agreeing to accept bribes and kickbacks in exchange for their official action and assistance and for violating their official and fiduciary duties in connection with the affairs of Airline-1.

F. Company-1 was a New Jersey holding company for several different operating groups. Company-1, through its operating groups, provided facility maintenance and construction services, including at Newark Airport.

G. Co-Conspirator-3 was the Chief Executive Officer of Company-1 and worked in New Jersey.

H. Co-Conspirator-4 was the director of a component within Company-1 and worked in New Jersey.

## THE OFFENSE

2. From in or about mid-2021 through in or about November 2022, in Essex, Union, Burlington, and Monmouth Counties, in the District of New Jersey; and elsewhere, defendant

**ALOK SAKSENA,**

Co-Conspirator-1, Co-Conspirator-2, Co-Conspirator-3, Co-Conspirator-4, and others (collectively, the "Conspirators") did knowingly and intentionally conspire and agree with each other and others to devise and execute a scheme and artifice to defraud Airline-1 of its right to the honest services of defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 in the affairs of Airline-1, facilitated by the use of interstate wire transmissions, contrary to Title 18, United States Code, Sections 1343 and 1346.

### The Goal of the Conspiracy

3. The goal of the conspiracy was for defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2: (a) to receive bribes and kickbacks from Company-1 in exchange for their assistance in matters over which defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 had authority and discretion as Airline-1 representatives related to contracts Airline-1 awarded to companies; and (b) to fraudulently inflate change orders for work Company-1 performed for Airline-1 in order to cover, at least in part, the cost of the bribes and kickbacks.

3

### Manner and Means of the Conspiracy

4. To carry out the conspiracy and to effect its unlawful goal and object, defendant SAKSENA and his co-conspirators engaged in a variety of means and methods including, among others, those described below.

5. In or about mid-2021, Company-1 bid on a general contracting contract (the "General Contracting Contract") with Airline-1. The company that won this contract would provide as-needed facilities maintenance services to Airline-1. Co-Conspirator-2 was able to influence which company won the General Contracting Contract. Co-Conspirator-2 was also instrumental in determining whether the company that won the contract was then assigned jobs pursuant to the contract.

6. In or about that same time, Company-1, through Co-Conspirator-4, agreed to pay for renovations to a bathroom at Co-Conspirator-2's personal residence in Burlington County, New Jersey ("Co-Conspirator-2's Residence"). Company-1 engaged a construction company (the "Construction Company") to do the work. Co-Conspirator-2 accepted payment for the renovations in exchange for his assistance in: (a) helping Company-1 win business with Airline-1, including the General Contracting Contract; and (b) introducing Company-1 representatives to other Airline-1 representatives, including defendant SAKSENA, who could also award work to Company-1.

7. In furtherance of their agreement, Co-Conspirator-2 took steps to ensure that Company-1 was awarded the General Contracting Contract, including by advocating within Airline-1 for awarding the General Contracting Contract to

4

Company-1. In or about August 2021, Company-1 was notified that it was awarded the General Contracting Contract. By in or about September 2021, the bathroom renovation was completed at Co-Conspirator-2's Residence. The total cost for the renovation was approximately $25,000. As agreed upon, Company-1 paid for the renovation.

8. On or about September 22, 2021, Co-Conspirator-1 sent an email on behalf of Airline-1 inviting Company-1 to bid on a contract to renovate restrooms at Terminal C at Newark Airport (the "Restroom Renovation Contract").

9. On or about September 29, 2021, Company-1 submitted its bid for the Restroom Renovation Contract. Company-1's total bid amount was over $19.7 million, which was higher than bids submitted by the two other companies that bid on contract ("Company-2" and "Company-3," respectively). Company-1's bid package was a total of two pages long, while Company-2's bid package was approximately 48 pages long, and Company-3's bid package was approximately 54 pages long.

10. In or about the time that the Restroom Renovation Contract was put out for bid, defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 reached an understanding with representatives of Company-1, including Co-Conspirator-3 and Co-Conspirator-4, that Company-1 would make payments to defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 in the form of home renovations and expensive items, in exchange for their assistance in awarding lucrative Airline-1 contracts to Company-1, including the Restroom Renovation Contract.

11. For example, in or about September 2021, defendant SAKSENA requested that Company-1 renovate three bathrooms at defendant SAKSENA's personal residence in Monmouth County, New Jersey ("defendant SAKSENA's Residence"). Company-1 engaged the Construction Company to do the work. By late September 2021, defendant SAKSENA had also requested that Company-1 pay for renovations on other parts of defendant SAKSENA's Residence. The Construction Company started the renovations on or about October 4, 2021.

12. On or about October 5, 2021, Co-Conspirator-2 sent Co-Conspirator-4 an email entitled, "[Co-Conspirator-2's Residence] Project." The email included a schematic of proposed renovations to the back and front of Co-Conspirator-2's Residence, along with proposed renovations of a deck and shed.

13. On or about October 7, 2021, the selection committee at Airline-1 met to review and score the bids on the Restroom Renovation Contract. Defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 were voting members on the committee. Each of them voted to award the Restroom Renovation Contract to Company-1.

14. Later in the day on or about October 7, 2021, Co-Conspirator-1 sent an email to Company-1 informing Company-1 that Airline-1 was awarding the Restroom Renovation Contract to Company-1. Co-Conspirator-3 responded, "Great news! Thanks everyone."

15. Defendant SAKSENA's list of requested renovations to defendant SAKSENA's Residence expanded beyond the bathrooms. For example, in or about

early 2022, the Construction Company sent an email to Co-Conspirator-4 stating, "I have attached the ever-evolving list of items. . . . When you look at the list, you will see some of the original items (the bathroom renovations) and then you will see some minor things (installing some cabinet doors and the screen door that finally came in, basic home repairs & maintenance[)], but then as you go down the list, you will see some of the bigger items he is asking for so I wanted you to have a heads up so you can guide us as to how you want to proceed." Included on the list were, among other items, the following: renovating multiple bathrooms, including a Jack and Jill bathroom; building a fifth bathroom in the basement; renovating the master bathroom; building a new deck; and paving the driveway. Company-1 agreed to pay for most of these renovations.

16. In or about December 2021, defendant SAKSENA provided Company-1 with a list of items to be purchased for defendant SAKSENA for the Christmas holiday ("defendant SAKSENA's Christmas List"). Defendant SAKSENA expected that Company-1 would purchase the items on the list for defendant SAKSENA. Defendant SAKSENA's Christmas List included guitars and guitar amplifiers, Rolex watches, Airpods, iPads, an Apple watch, gaming monitors, a foosball table, and a 9-room dollhouse. Company-1 purchased most of the requested items and provided them to defendant SAKSENA. Company-1 also purchased diamond earrings and gave them to defendant SAKSENA. In total, the items on defendant SAKSENA's Christmas List, along with the diamond earrings, cost over $30,000.

7

17. In or about early December 2021, Co-Conspirator-1 also provided Company-1 with a list of items to be purchased for Co-Conspirator-1 for the Christmas holiday ("Co-Conspirator-1's Christmas List"). Co-Conspirator-1 expected Company-1 to purchase the items on the list for Co-Conspirator-1. Co-Conspirator-1's Christmas List included a computer and accessories, an iPad, a portable speaker, a Wi-Fi pet camera, an air purifier, a coffee maker, a designer purse and wallet, and a Nintendo Switch. In total, the items on Co-Conspirator-1's Christmas List cost over $7,900. Company-1 purchased most of the items on Co-Conspirator-1's Christmas List. Company-1 also paid over $10,000 for two vacations for Co-Conspirator-1—one to Disney World and one to the Philippines.

18. Co-Conspirator-2 also requested that Company-1 purchase earrings and a necklace for Co-Conspirator-2. On or about December 14, 2021, Company-1 purchased these items for Co-Conspirator-2. The earrings and necklace, together, cost approximately $1,700.

19. On or about January 19, 2022, Co-Conspirator-1 prepared a package of information related to the Restroom Renovation Contract for internal circulation at Airline-1. There was a coversheet accompanying the contract, which required the signature of five Airline-1 representatives, including defendant SAKSENA and Co-Conspirator-1. The coversheet included a sub-section called "Bid Justification," which falsely stated, "Vendor was the lowest biddger [sic] . . . ."

20. On or about January 19, 2022, Co-Conspirator-1 transmitted the Restroom Renovation Contract and accompanying coversheet by email from a

location in New Jersey to other Airline-1 representatives for their signature; it was signed by Airline-1 signatories located in Colorado, New Jersey, and Illinois.

21. Within the Restroom Renovation Contract itself was a section titled "Compliance with Anti-Bribery and Anti-Corruption Laws." As set forth in that section, Company-1 agreed to abide by all applicable laws, including anti-bribery and anti-corruption laws, and to comply with Airline-1's Anti-Bribery/Anti-Corruption Compliance Policy. Further, Company-1 agreed that all "Applications for Payment, invoices, reports, statements, and books and records" that it submitted would be "true and accurate in all respects, and [would] fully and accurately describe services rendered and the nature and recipient of expenditures and/or payments made." Co-Conspirator-4 signed the Restroom Renovation Contract on behalf of Company-1.

22. In or about early 2022, Co-Conspirator-1 purchased a new home in Union County, New Jersey ("Co-Conspirator-1's Residence"). As with defendant SAKSENA and Co-Conspirator-2, Co-Conspirator-1 asked for Company-1 to make and pay for renovations to Co-Conspirator-1's Residence. Co-Conspirator-1 provided the Construction Company with a list of requested renovations that set forth approximately 80 line items, including installing a new hardwood floor in the living room; installing new insulation and sheetrock; renovating and expanding a powder room; redoing all closets; and renovating the kitchen to include new appliances, installing an island with built-in seating, and adding a wet bar with a wine refrigerator and ice machine. Company-1 agreed to pay for most of these renovations.

23. During the renovations, Co-Conspirator-3 and Co-Conspirator-4 provided each of defendant SAKSENA and Co-Conspirator-2 with approximately $10,000 in cash to pay directly to the Construction Company so that the Construction Company would provide both defendant SAKSENA and Co-Conspirator-2 a receipt for the payment. This arrangement was intended to create the false appearance that defendant SAKSENA and Co-Conspirator-2 were paying for their own renovations. Co-Conspirator-4 also discussed such an arrangement with Co-Conspirator-1, but Co-Conspirator-1 never received the cash.

24. In total, Company-1 paid approximately $488,000 for renovations at defendant SAKSENA's Residence, approximately $388,000 for renovations at Co-Conspirator-1's Residence, and approximately $265,000 for renovations at Co-Conspirator-2's Residence.

25. In addition to these renovations, Company-1 paid approximately $33,000 to install a deck at the residence of one of defendant SAKSENA's relatives. Company-1 also hired one of Co-Conspirator-2's relatives for a "no-show" job. Between on or about November 15, 2021 and on or about October 16, 2022, this relative earned approximately $59,000 in gross wages from Company-1 for work that was never performed by Co-Conspirator-2's relative.

26. Company-1 provided the benefits described above to defendant SAKSENA, Co-Conspirator-1, and Co-Conspirator-2 in exchange for winning the Restroom Renovation Contract and with the expectation that defendant SAKSENA,

Co-Conspirator-1, and Co-Conspirator-2 would use their positions with Airline-1 to help Company-1 obtain future Airline-1 contracts.

## *Fraudulent Change Orders*

27. As with many construction contracts, the Restroom Renovation Contract allowed for amendments to the contract that would change the original scope of work and the project's cost, also known as "change orders." These change orders usually reflected increases to the scope of work and, consequently, increased costs. The Conspirators used these change orders fraudulently to fund the bribes and kickbacks, as described below.

28. On or about August 26, 2022, during a telephone conversation, Co-Conspirator-4 told defendant SAKSENA that Company-1 had incurred approximately $1 million in costs for renovations to defendant SAKSENA's Residence, Co-Conspirator-1's Residence, and Co-Conspirator-2's Residence and that it had not been able to recoup its costs through funds that Company-1 had received through its contracts with Airline-1. Co-Conspirator-4 stated that Company-1 was going to halt construction on defendant SAKSENA's Residence if Company-1 did not start to recoup some of its costs. Defendant SAKSENA proposed that Co-Conspirator-4 "pad," or artificially inflate, change orders. Defendant SAKSENA specifically mentioned three change orders for work that Company-1 was contracted to perform for Airline-1 at Newark Airport, namely the "borings" (the "Borings Change Order"), the "actual temp restroom" (the "Temporary Restrooms Change Order"), and the "family restroom" (the "Family Restroom Change Order"). Defendant SAKSENA also

11

stated that he had $5 million in contingency funds available under the Restroom Renovation Contract that could be made available to Company-1. In another conversation, defendant SAKSENA referred to the $5 million contingency stating, ". . . just consider the rest of the 5 million, profit. 'Cause we'll . . . find a way to tap into it. We'll use it."

29. On or about September 3, 2022, during another telephone call, Co-Conspirator-4 and defendant SAKSENA further discussed their plan to submit fraudulent change orders as part of the conspiracy. Defendant SAKSENA told Co-Conspirator-4 that defendant SAKSENA had discussed their plans with Co-Conspirator-1 and explained, "We did stuff for [Co-Conspirator-1]. . . . I needed [Co-Conspirator-1] to get taken care of to some degree because [Co-Conspirator-1's] the one doing all your invoices. [Co-Conspirator-1's] the one that actually invokes all the procedures that I don't know how to do. . . . So, I need [Co-Conspirator-1]."

30. Co-Conspirator-4 told defendant SAKSENA that Co-Conspirator-2 was the "biggest nut right now" and requested that defendant SAKSENA "tone [Co-Conspirator-2] down." Defendant SAKSENA said he could "definitely tone [Co-Conspirator-2] down." Defendant SAKSENA added, "There's . . . a lot of stuff being put in motion. . . . with all of that you guys'll start to see a waterfall . . . and it's gonna be good. So . . . that should clean up everything, basically. That should even take care of [Co-Conspirator-2]. . . . I can tell [Co-Conspirator-2] that we had a conversation and . . . we can . . . hold off, just be patient."

31. Co-Conspirator-2 was aware that Company-1 was going to submit fraudulently inflated change orders to recoup some of the cost of the renovations.

### *Borings Change Order*

32. On or about September 8, 2022, Co-Conspirator-4, who was located outside of Kentucky, had a telephone call with defendant SAKSENA, who was located in Kentucky. During that call, Co-Conspirator-4 explained to defendant SAKSENA that the estimated true cost of the Borings Change Order (i.e., what the project was actually going to cost Company-1) was "roughly 240" (i.e., $240,000). defendant SAKSENA proposed that they "go like 320, 330," meaning fraudulently inflate the change order from approximately $240,000 to approximately $320,000 or $330,000.

33. On or about September 8, 2022, Co-Conspirator-4 had a telephone conversation with Co-Conspirator-1. Co-Conspirator-4 told Co-Conspirator-1 that Co-Conspirator-4 was sending over the Borings Change Order. Co-Conspirator-1 asked if it was "a lot," and Co-Conspirator-4 replied that Co-Conspirator-4 did what defendant SAKSENA told Co-Conspirator-4 to do. Co-Conspirator-1 replied that it was "no problem."

34. On or about September 8, 2022, Company-1 submitted the Borings Change Order to Co-Conspirator-1 via email, requesting the payment of $339,998.48.

35. On or about September 9, 2022, Co-Conspirator-1 circulated the inflated Borings Change Order for signature by Airline-1 signatories. Co-Conspirator-1 transmitted the Borings Change Order via email from a location in New Jersey, and it was signed by other Airline-1 signatories located in Illinois, Kentucky, and Texas.

There were four Airline-1 signatories on the Borings Change Order, including defendant SAKSENA and Co-Conspirator-1.

36. On or about that same day, the Borings Change Order was approved by Airline-1 for the fraudulently inflated amount of $339,998.48.

*Temporary Restrooms Change Order*

37. On or about September 14, 2022, during a telephone conversation between the two of them, Co-Conspirator-4 told defendant SAKSENA that the estimated cost for the Temporary Restroom Change Order was "1.7" (i.e., $1.7 million). Defendant SAKSENA instructed Co-Conspirator-4 to inflate the change order, stating, "Come in at 2.1" (i.e., $2.1 million).

38. On or about September 14, 2022, Co-Conspirator-4 and Co-Conspirator-1 discussed the Temporary Restrooms Change Order during a telephone call. Co-Conspirator-4 stated that the estimated cost came in at approximately "1.7." Co-Conspirator-4 further relayed that defendant SAKSENA had told Co-Conspirator-4 "to go in at 2.1" and to call Co-Conspirator-1 to give Co-Conspirator-1 a "heads up" before Co-Conspirator-4 submitted the change order. Co-Conspirator-1 replied, "Okay, alright if that's what he says, okay."

39. On or about September 14, 2022, Company-1 submitted the Temporary Restrooms Change Order to Co-Conspirator-1 via email, requesting the payment of $2,062,483.62.

40. On or about September 14, 2022, Co-Conspirator-1 circulated the Temporary Restrooms Change Order for signature by Airline-1 signatories. Co-

Conspirator-1 transmitted the Temporary Restrooms Change Order via email from a location in New York, and it was signed by other Airline-1 signatories located in Illinois, New Jersey, and Texas. There were four Airline-1 signatories on the Temporary Restrooms Change Order, including defendant SAKSENA and Co-Conspirator-1.

41. On or about September 16, 2022, the Temporary Restroom Change Order was approved by Airline-1 for the fraudulently inflated amount of $2,062,483.62.

In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

42. Upon conviction of the offense charged in this Information, defendant

**ALOK SAKSENA**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, defendant SAKSENA obtained that constituted, or was derived from, proceeds traceable to the commission of the offense, and all property traceable to such property.

43. If any of the above-described forfeitable property, as a result of any act or omission of defendant SAKSENA:

    A. cannot be located upon the exercise of due diligence;

    B. has been transferred or sold to, or deposited with, a third party;

    C. has been placed beyond the jurisdiction of the court;

    D. has been substantially diminished in value; or

    E. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) (as incorporated by 28 U.S.C. § 2461(c)), to seek forfeiture of any other property of defendant SAKSENA up to the value of the forfeitable property.

_____
PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: __23-cr-982__

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

ALOK SAKSENA

# INFORMATION FOR

18 U.S.C. §§ 1343, 1346, and 1349

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

KATHERINE J. CALLE
VIKAS KHANNA
FRANCESCA LIQUORI
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
973-645-2752